LAW OFFICES OF



# STEINHARDT, SISKIND & LIEBERMAN
——— LLC ———

Michael D. Steinhardt
mds@steinhardtlawfirm.com

Keith R. Siskind
krs@steinhardtlawfirm.com

Jordan E. Lieberman
jel@steinhardtlawfirm.com

Quarterfield Center
808 Landmark Drive, Suite 227
Glen Burnie, Maryland 21061-9998
www.steinhardtlawfirm.com

Telephone:
410-766-7630

Toll Free:
1-866-902-4111

Fax:
410-766-8794
410-766-7631

June 3, 2020

**VIA EMAIL: SCHNITTKER.TORI@PRINCIPAL .COM AND FAX 1-800-255-6609**
Principal Life Insurance Company
Group Life and Disability Claims
711 High Street
750-8A24
Des Moines, IA 50392
**ATTN.: TORI SCHNITTKER**

        Re: Claimant: Sharon Gilbert
        Claim No.: 5966152

Dear Ms. Schnittker:

    As you know this firm represents Sharon Gilbert in connection with her claims for short term disability (STD), long term disability (LTD) and life coverage during disability (LCDD) benefits. The purpose of this correspondence is to submit additional information in support of Dr. Gilbert's voluntary appeal following Principal's denial of February 12, 2020. **(Exhibit 1).**

### A. Background

    Sharon Gilbert is 60 years of age with a date of birth of ███████, 1960. Dr. Gilbert has a PhD in Epidemiology from George Washington University that she received in 2013. Dr. Gilbert received an undergraduate degree in Biology from Binghamton University in 1982, followed by a Master's in Finance and Marketing from Binghamton in 1984. In 1998 Dr. Gilbert obtained a second Master's degree in Statistics from George Washington University. A copy of Dr. Gilbert's resume is attached with **Exhibit 4, pages 1A – 1C.**

    Dr. Gilbert was hired by Tunnell Government Services (Tunnell) on November 17, 2015 as a Biostatistician. Dr. Gilbert's base salary was $ 142,100.00. Dr. Gilbert ceased working as of September 11, 2018 because of multiple symptoms including but not limited to intense fatigue, daily headaches, confusion, brain-fog, debilitating chills, daily chest pain, neuropathy (burning nerve pain in legs), joint pain, and occasional nausea. Dr. Gilbert's symptoms in September 2018 are more particularly outlined in her Statement of May 28, 2020 attached with **Exhibit 4 page 124.** Dr. Gilbert has been under the care and treatment of Dr. Joseph Jemsek since September 2016. Dr. Jemsek diagnosed Dr. Gilbert with Lyme disease. Dr. Gilbert was exposed to Lyme in June 2011 when she was at a national park in Saratoga New York on a hiking trip and woke up one morning to find

...

herself covered with 20 or more ticks.  She developed symptoms that advanced into a chronic long-term inflammatory illness with multisystemic involvement and immune dysregulation.

     Dr. Gilbert applied for STD, LTD, and LCDD benefits but such claims were denied by Principal in a letter dated January 9, 2019.  **(Exhibit 2).**  On July 2, 2019 Dr. Gilbert filed an appeal on her own behalf.  **(Exhibit 3).**  The appeal was denied by Principal in its final decision of February 12, 2020.  **(Exhibit 1).**  Principal denied benefits based upon the results of various medical evaluations, including those of Dr. Ross Meyerson and Dr. Phillip Kempf.  Principal concludes that Dr. Gilbert's complaints are unsupported by the medical records and physical examinations and finds that Dr. Gilbert is suffering from a "somatization syndrome."**  Principal believes that the diagnosis of Lyme disease is unsupported and determined that Dr. Gilbert is capable of full time work as of September 11, 2018 to present.

     *(\*\*Somatic symptom disorder (SSD) occurs when a person feels extreme, exaggerated anxiety about physical symptoms.  The person has such intense thoughts, feelings, and behaviors related to the symptoms, that they feel that they cannot do some of the activities of daily life... A person with SSD is not faking their symptoms.  The pain and other problems are real.  They may be caused by a medical problem.* **www.medlineplus.gov.**)

     The diagnosis of somatization syndrome came from the evaluation of Dr. Ross Myerson on December 4, 2018 prior to Principal's initial denial on January 9, 2019 **(Exhibit 2).**  However, Dr. Myerson stated that a Psychiatrist would be more qualified to render a diagnosis.  Dr. Myerson also opined that there is no "objective evidence" that Dr. Gilbert "...has or ever has had Lyme disease or Babasia."  Dr. Myerson concludes that Dr. Gilbert's complaints are "...likely functional in nature (psychological)" and that she does not have restrictions or limitations based upon these complaints.  Dr. Myerson expresses no opinion whatsoever regarding Dr. Gilbert's ability to perform her "own job/own occupation" as refenced in Principal's letter of January 9, 2019.

     In his evaluation of October 16, 2019, Dr. Kempf found "no clinical or serologic evidence to support a diagnosis of Lyme Disease."  He incorrectly stated that Dr. Gilbert did not have tick bites which brings into question Dr. Kempf's review of Dr. Gilbert's medical history.  Dr. Kempf does make some other interesting and contradictory statements.  For example, Dr. Kempf states that Dr. Gilbert is not magnifying her symptoms and confirms that she has a multitude of subjective symptoms including headache, chest pain, paresthesia, hypersomnia, and fatigue.  Although Dr. Kempf expresses an opinion that Dr. Gilbert does not have Lyme Disease he states the following:  *"I think she has a multitude of subjective symptoms that have impacted her, but I feel not related to her presumed Lyme diagnosis."*

     Principal also relied upon a peer review of Dr. Jason Wirtz of December 12, 2019.  Although Dr. Wirtz did not personally examine Dr. Gilbert, he comments that Dr. Gilbert's symptoms do not correlate with the findings on physical examination.  He expresses an opinion that there are no "objective findings" of Lyme Disease at any stage.  As a result, Dr. Wirtz finds that Dr. Gilbert is not functionally impaired from an infectious disease perspective.

     Before issuing its denial of February 12, 2020, Principal obtained another peer review from Dr. Evan Li on February 11, 2020.  Dr. Li found that Dr. Gilbert's fatigue cannot be explained by "objective measures to date."  Dr. Li concludes that Dr. Gilbert's fatigue cannot be attributed to Lyme

Disease, but states the following: *"She may have another condition such as fibromyalgia or chronic fatigue syndrome that is causing her fatigue and pain however neither of these conditions have been formally evaluated and there is no objective evidence to support impairment at this time."*

Regrettably for Principal, the STD, LTD and LCDD plans at issue do not contain language that require the submission of "objective proof" of disability. In *Cosey v. Prudential*, 735 F.3d 161 (4th Cir. 2013) the court found that if a plan is seeking "objective proof" of disability than the plan must contain such a requirement. Otherwise, without such language a claim cannot be denied based upon reliance on subjective complaints. Principal's continued demand to produce objective evidence (as determined by their own expert's reports) without the required plan language, rises to the level of an abuse of discretion.

Furthermore, Principal was aware that Dr. Gilbert filed for Social Security Disability benefits and was awarded such benefits at the initial level. The Disability Determination **(Exhibit 4 pages 2 – 12)** found impairments including tickborne disease, neuropathy, chronic fatigue syndrome, anxiety due to illness, dysautonomia, blood pressure dysregulation, orthostatic intolerance, and pericarditis. Symptoms included pain, malaise, weakness, fatigue, understanding and memory limitations and sustained concentration and persistence limitations. The Social Security Administration found that Dr. Gilbert's functional status is not consistent with the ability to perform work. Dr. Gilbert is unable to sustain a 40 hour work week due to the limiting fatigue, pain and neuro-irritability. The Social Security Administration determined that Dr. Gilbert's onset date for disability was September 11, 2018, the same date that she ceased working for Tunnell.

## B. Eligibility

The plans at issue include a STD plan established by Tunnell for its employees with a summary of benefits effective January 1, 2018. There is an elimination period of 8 days. The primary benefit is 70% of pre-disability earnings. The maximum payment period is 12 weeks. The plan administrator is Tunnell Consulting, Inc. and this is an ERISA plan. The definition of disability on page 23 of the plan is as follows:

> *Disability; Disabled*
> *You will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy, one of the following applies:*
>
> a. *You cannot perform the majority of the Substantial and Material Duties of your Own Job.*
>
> b. *You are performing the duties of your Own Job on a Modified Basis or any job and are unable to earn more than 80% of your Predisability Earnings.*

Additionally, the term "own job" is defined on page 27 of the plan as the job that you are routinely performing for the plan holder when your disability begins.

The LTD plan is a group policy issued by Principal Financial Group (Principal) to Tunnell with an effective date of May 1, 2017. The plan has a 90 day elimination period. The primary monthly

3

benefit is 60% of pre-disability earnings. The maximum duration for benefits is Social Security Normal Retirement Age, which is age 67 for Dr. Gilbert. The definition of disability is as follows:

> *Disability; Disabled*
> *A Member will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy:*
>
> *During the Elimination Period and the Own Occupation Period, one of the following applies:*
>
> a. *The Member cannot perform the majority of the Substantial and Material Duties of his or her Own Occupation.*
> b. *The Member is performing the duties of his or her Own Occupation on a Modified Basis or any occupation and is unable to earn more than 80% of his or her Indexed Predisabiltiy Earnings.*
>
> *After completing the Elimination Period and the Own Occupation Period, one of the following applies:*
>
> a. *The Member cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience.*
> b. *The Member is performing the Substantial and Material Duties of his or her Own Occupation or any occupation on a Modified Basis and is unable to earn more than 60% of his or her Indexed Predisability Earnings.*

Additionally, the term own occupation is defined in the plan as follows:

> *Own Occupation*
> *The occupation the Member is routinely performing for the Policyholder or a Participating Unit when his or her Disability begins as performed in the national economy.*

The third plan is a group member life insurance policy which includes life insurance coverage for all members in an amount that is equal to 2x the member's annual compensation not to exceed $350,000.00. The term total disability or totally disabled for LCDD purposes is defined as follows:

> *Total Disability; Totally Disabled*
> *A Member's inability, as determined by The Principal, due to sickness or injury, to perform the majority of the material duties of any occupation for which he or she is or may reasonably become qualified based on education, training or experience.*

Consequently, the primary issue for this appeal are whether Dr. Gilbert can perform the majority of the substantial and material duties of her own occupation as of September 11, 2018 when she ceased working for STD and LTD purposes, and any occupation for LCDD.

### C. Standard of Review

Needless to say we disagree with the determination by Principal and find that the decision is unreasonable and not supported by the evidence. Pursuant to the Supreme Court decision in the case of Firestone Tire and Rubber Co. v. Bruch, 449 U.S. 101, 109 S. Ct. 948 (1989), the Supreme Court set the standard of review in benefit denial cases as follows:

> *A denial of benefits challenged under Section 1132(a)(1)(B) must be reviewed under a de novo standard unless the benefit plan expressly gives a plan administrator or fiduciary discretionary authority to determine eligibility of benefits or to construe the plan's terms, in which case a deferential standard of review is appropriate.*

Dr. Gilbert was hired by Tunnell in November 2015. Tunnell issued the STD plan as of January 1, 2018, and the LTD plan was updated on May 1, 2017. Both plans include policy interpretation provisions as follows:

**STD Plan**
*The Planholder, as plan administrator within the meaning of ERISA, has complete discretion to construe or interpret all provisions, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided. The Planholder's decisions in such matters shall be controlling, binding, and final. In any action to review any such decision by the Planholder, the Planholder shall be deemed to have exercised its discretion properly unless it is proved duly that the Planholder has acted arbitrarily and capriciously.*

**LTD Plan**
*Article 9 – Policy Interpretation*
*The Principal has complete discretion to construe or interpret the provisions of this group insurance policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided. The decisions of The Principal in such matters shall be controlling, binding, and final, in accordance with the Unfair Insurance Practices Act as between The Principal and persons covered by this Group Policy, subject to the Claims Procedures in Part IV, Section Q of this Group Policy.*

Consequently, taken at face value, it appears that an abuse of discretion might apply if this matter proceeds to court. However, on October 1, 2011 the State of Maryland adopted Maryland Code Insurance Article 12-211 which states the following:

> *A disability insurance policy may not be **sold, delivered, or issued** for delivery in the state by a carrier if the policy contains a clause that purports to reserve sole discretion to the carrier to interpret the terms of the policy or to provide standards of interpretation or review that are inconsistent with the laws of the state.* (emphasis added)

Therefore, it is our contention that Maryland law invalidates the grant of discretionary authority in the STD and LTD plans since they were either "**sold, delivered, or issued** for delivery in the state..." Dr. Gilbert was employed by Tunnell since 2015 in the State of Maryland. The plans

5

were delivered to employees in Maryland after the aforesaid statute was enacted in October 2011. Maryland has established a strong public policy by adopting Maryland Code, Insurance Article 12-211, banning such discretionary review provisions in disability insurance policies. Therefore, it is our contention that if this matter proceeds to court a de novo standard of review will apply.

Pursuant to a de novo standard the Court will interpret the plan language without giving deference to either party's interpretation. The Supreme Court in Firestone explained as follows:

> *The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust as the Court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney.* Firestone, 109 S. Ct. at 955.

Also, in the Fourth Circuit de novo review is akin to a bench trial on the paper record requiring the Court to make "explicit findings of fact and conclusions of law." Neumann v. Prudential Ins. Co. of America, 367 F. Supp. 2d 969, 980 (D.C. Va. 2005).

Finally, the Department of Labor Regulations require that Principal conduct a full and fair review. Specifically, Section 2560.503-1(h)(2) of the Department of Labor Regulations require that the claims procedures, "provide for a review that takes into account all comments, documents, records or other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." This obligation was acknowledged by the Fourth Circuit in the case of Evans v. Metropolitan Life Insurance Co., 358 F.3d 307, 315 (4th Cir. 2004).

### D. Evidence in Support of Disability

It is submitted that the documentation provided with this letter, along with the documentation contained in the Administrative Record, supports Dr. Gilbert's claim that she is entitled to STD, LTD and LCDD benefits. Therefore, the decision to deny such benefits to Dr. Gilbert was arbitrary and unreasonable, and not based upon substantial evidence in view of this supporting documentation.

Please refer to **Exhibit 4** which is a summary of supplemental documents in support of Dr. Gilbert's claim that she is unable to perform the substantial and material duties of her own occupation as a Biostatistician. These records include but are not limited to the following references:

| Pages | Reference |
|-------|-----------|
| 13 – 31 | Dr. Gilbert has been under the care and treatment of Dr. Joseph Jemsek since her initial consultation of September 1, 2016. Reports between September 2016 and March 2020 are attached. Dr. Gilbert's last day of work was September 10, 2018. Principal has declined to pay any benefits to Dr. Gilbert. Consequently, the primary focus of these records is Dr. Gilbert's medical condition in and around September 2018 when she ceased working and thereafter. Evidence of Dr. Gilbert's deteriorating condition is documented in a letter of Dr. Jemsek of August 14, 2018 **(page 32)**. Dr. Jemsek states the following: |

6

|   |   |
|---|---|
|   | *Unfortunately, she continues to experience considerable symptomatology related to this illness. Specific signs and symptoms include, although are certainly not limited to: persistent, profound, and often debilitating fatigue; atypical chest pain and labile blood pressure, felt to be the result of autonomic nervous system dysfunction; musculoskeletal pain, achiness, and soreness as well as burning nerve pain; frequent headache; and intermittent fevers and daily or near daily day and night sweats… Ms. Gilbert suffers substantial difficulties particularly as regards; stamina and endurance (both physical and mental, in which renders her easily exhausted after even undemanding activity, after which she requires extensive rest and recuperative interventions (concentration) repeated due to the extremely high distractibility of her symptoms); and stress, sensory, and activity tolerances… Ms. Gilbert has attempted to utilize accommodations available through her workplace, including intermittent leave under the Family and Medical Leave Act (FMLA). Despite this, her condition remains fragile and has come to a point whereby she cannot sustain work activity in any capacity on a sustained, consistent and predictable basis.* |
| 33 – 37 | On September 10, 2018 Dr. Jemsek completed the Certification of Healthcare Provider regarding FMLA for Dr. Gilbert. **(Pages 33 – 37)**. Dr. Jemsek indicated that Dr. Gilbert is "unable to perform any and all essential job functions (including basic, consistent and predictable attendance)." In describing the relevant facts causing Dr. Gilbert to seek leave, Dr. Jemsek states the following:<br><br>*We had previously recommended in March 2018 that Ms. Gilbert intermittently take time off of work as per FMLA guidelines. It is our understanding, however, that she was not able to adequately utilize this leave time due to employer demands as well as the demands of her work schedule. Unfortunately, the extraneous stress over the past few months has cumulatively destabilized our patient in such a significant way that she can no longer tolerate work activity in any capacity. It is therefore our best medical recommendation that she utilize full (continuous) leave of absence in order to best focus on treatment, rest and healing.*<br><br>**This statement of Dr. Jemsek is consistent with the deteriorating symptoms described by Dr. Gilbert in her statement of May 28, 2020. Further, Dr. Jemsek has firsthand knowledge of Dr. Gilbert's medical condition, having performed multiple physical examinations since September 1, 2016.** |
| 38 – 39 | In evaluating Dr. Gilbert's claim for benefits, Principal sought further information from Dr. Jemsek. Consequently, Dr. Jemsek responded to a series of questions on October 15, 2018. Dr. Jemsek described a change in treatment for Dr. Gilbert beginning in August 2018. Explaining the reasons that Dr. Gilbert was no longer able to work after September 10, 2018, Dr. Jemsek stated the following:<br><br>*As of 5/14/18, her health status was still poor and she had been amenable to* |

7

| | |
|---|---|
| | *leave of absence, our office certainly would have supported this from a medical and functional standpoint. Ms. Gilbert has always been highly motivated to continuing with work activities despite her health issues but her ability to tolerate such is self-limiting and by September 2018 she was unable to perform essential job duties without further damage to her already fragile health status. In other words, while she was able to push through with work this was extremely difficult and she had to neglect home/daily activities.* ***In September 2018 she reached the point whereby she was…forced to cease work.*** (emphasis added) |
| 40 – 42 | In further support of Dr. Gilbert's disabling condition, Dr. Jemsek wrote a letter on May 28, 2019. Dr. Jemsek describes the background of Dr. Gilbert's diagnosis of Lyme borreliosis. He notes that resistance and recurrence are common features of the illness. He further notes that borealis complex entails chronic manifestations that may be "severe and disabling." Dr. Jemsek points to the objective findings in Dr. Gilbert's case including "extensive laboratory, procedural, and clinical abnormalities. She was initially diagnosed with Lyme borealis in May 2016 by Dr. Mangat based on positive Western blot testing, although treatment provided at that time was insufficient and her health issues continued to persist and progress." In describing Dr. Gilbert's medical condition, Dr. Jemsek states the following:<br><br>*Unfortunately, she continues to experience considerable symptomatology related to this illness. Specific signs and symptoms include, although are certainly not limited to: persistent, profound, and often debilitating fatigue; atypical chest pain and labile blood pressure, felt to be the result of autonomic nervous system dysfunction; musculoskeletal pain, achiness, and soreness as well as burning nerve pain; frequent headache; and daily or near daily day and night sweats.*<br><br>*In addition, she is easily overwhelmed and is much more susceptible to the deleterious effects of stress than her healthy cohort. Due to the immune dis-regularity characteristics of her health condition, she is also more prone to incidental infections, especially when around large groups of people.*<br><br>*Her overall functionality is impacted in multiple key areas, to include: stamina and endurance (both physical and mental, and which renders her extremely exhausted after even simple activities, from which she requires extensive time for rest and recuperation); concentration (impeded due to the high distractibility of her symptoms), and stress, sensory, and activity tolerances.* |
| 43 – 46 | Dr. Jemsek completed a Medical Assessment of Ability to do Work Related Activities (Physical) on March 23, 2020 describing Dr. Gilbert's restrictions and limitations. Consistent with Dr. Jemsek's opinion that Dr. Gilbert tried to "push through" with working, he indicates that these restrictions and limitations have persisted since **September 2016**. These restrictions include lifting/carrying occasionally 10 lbs.; standing/walking no more than 2 hours during an 8 hour day; sitting on average 20-30 minutes at one time and no more than 1 ½ hours during |

| | |
|---|---|
| | an 8 hour day; manipulative limitations such as reaching, handling and fingering; other impairments such as "brain-fog or cognitive impairment," and the ability to lie down 1-2 hours during an 8 hour day. |
| 47 – 55 | Dr. Gilbert has also remained under the care and treatment of her primary care physician, Dr. Lisa Ng. Reports between January 23, 2018 and November 18, 2019 are attached. On April 27, 2020 **(page 56)** Dr. Ng completed a Questionnaire regarding Dr. Gilbert's medical condition **as of September 2018**. Dr. Ng noted a primary diagnosis as follows: chronic Lyme disease, temperature instability, neuropathy, insomnia, blood pressure labile, headaches and joint pain. Dr. Ng also expressed an opinion that Dr. Gilbert was unable to perform the material and substantial duties of her own occupation as a Biostatistician as of September 11, 2018. Dr. Ng noted the following:<br><br>*She had headaches, fatigue, neuropathy, joint pains, chest pain, back pain, temperature instability, labile BP, drowsiness.*<br><br>Further, Dr. Ng indicated that as of her last examination of Dr. Gilbert on November 18, 2019, she remained totally disabled and unable to perform the material and substantial duties of her own occupation as a Biostatistician. |
| 57 – 61 | On February 12, 2019 Dr. Gilbert was evaluated by Dr. David Taragin, a neurologist. Dr. Taragin notes symptoms of numbness and paresthesia in Dr. Gilbert's legs as well as burning pain in her legs, calves, chest, and arms. He states that the symptoms are worse with sitting and better if she extends her legs at the knees. Her symptoms improve with sleep. Dr. Taragin recommended EMG testing for the numbness and tingling and headaches. |
| 61A – 61B | EMG and nerve conduction testing performed at the Neurology Center on February 19, 2019 reveals a normal exam of the lower extremities with no evidence of diffuse peripheral neuropathy, or lumbosacral radiculopathy. Dr. Gilbert returned to see Dr. Taragin in February 2020 **(report to be supplemented)** and he recommended a cervical MRI due to neck pain with upper extremity numbness. The report of Progressive Radiology dated February 28, 2020 **(pages 83-84)** reveals "Mild multiple degenerative spondylosis…most significant at C5/C6 where disc disease results in mild canal stenosis and abutment of the ventral spinal cord…" A skin biopsy was also recommended and performed on March 6, 2020 revealing neuropathy affecting small nerve fibers **(pages 85-86).** |
| 49 | After the nerve testing, Dr. Gilbert was seen by her primary care physician, Dr. Ng, on March 12, 2019. She continues to report difficulty with Lyme disease. She is constantly not feeling well and has so much fatigue which makes it difficult for her to work. |
| 62 – 68 | Dr. Gilbert was also evaluated on March 8, 2019 by her cardiologist, Dr. Joann Urquhart. The report notes that she was originally seen at age 57 with a history of chest discomfort. In 2013 she had a pulmonary embolism secondary to being on |

9

| | |
|---|---|
| | hormone replacement. She noted that she has been under the treatment of Dr. Jemsek for Lyme disease. She has developed chronic fatigue syndrome. The moment she gets up out of bed she feels "lightheaded." She denied shortness of breath. An electrocardiogram was normal. An echocardiogram performed March 8, 2019 was normal. Stress testing was normal. Dr. Urquhart notes that her chest discomfort may be related to her chronic Lyme disease. |
| 69 – 71 | On March 18, 2019 Dr. Gilbert was evaluated by another neurologist, Dr. Michael Sirdofsky. He noted "severe distal burning pain with occasional numbness and tingling and intact reflexes and motor strength suggestive of a small fiber neuropathy." Dr. Sirdofsky indicated that the prior EMG testing within normal limits is common with small fiber neuropathy. Dr. Sirdofsky suggested ongoing medication of Gabapentin 600 mg 3x per day with an addition of 300 mg at bedtime. Dr. Sirdofsky also suggested a referral to an infectious disease specialist to clarify Dr. Gilbert's history of Lyme disease. |
| 72 – 77 | On April 16, 2019 Dr. Gilbert was evaluated by Dr. Maryana Shenderov, an infectious disease specialist at Johns Hopkins for a second opinion. In her report Dr. Shenderov confirms tick exposure in 2011. Dr. Shenderov noted the following:<br><br>*May 2016 had Lyme WB as below and was told this confirmed Lyme disease, was given Amoxicillin and then Doxycycline x3 months. Had a lot of plaque on her teeth from the Doxycycline. Husband thinks knee swelling improved. She switched care to Dr. Jemsek in 2016, with continued antibiotic regimens since for Babesia/Lyme/Bartonella, etc. Symptoms now include head pain, chest pain, left and right forearm nerve pain, tingling in her fingers, pain in both feet, numbness in both feet, blood pressure fluctuations, flushing/sweating episodes, etc.*<br><br>Dr. Shenderov's opinion is as follows:<br><br>*This is a 59 y.o. female who has had migratory b/l nerve-type pain/discomfort in arms and legs, HA and flushing episodes over the past few years, and has been through multiple empiric rounds of various antibiotics on a rotating schedule per Dr. Jemsek for possible tick borne disease, although serologies were negative, and is very concerned about remaining dormant tick borne bacteria as a root cause. Her symptoms are not c/w meningitis or neuro-Lyme, **but could fit post-treatment Lyme disease syndrome.** (emphasis added) Her Lyme WB test was negative. She may not have had Lyme at all, but did have possible tick exposures. At this point, she has had more than enough doxycycline to cule Lyme and other tick borne illnesses. After a long discussion and close attention to her various complaints and symptoms over the years, my recommendation to her was to stop the unwarranted antimicrobials and supplements, and then see what symptoms still remain and require workup. Her symptoms suggest nerve like discomfort but no neurological or rheumatological signs or red flag symptoms at all…* |

10

|  | Dr. Gilbert did not follow with Dr. Shenderov due to the lengthy commute. |
|---|---|
| 26 – 27 | Dr. Gilbert returned to see Dr. Jemsek on July 23, 2019. Dr. Jemsek noted that Dr. Gilbert is still experiencing stamina issues. She has limited exercise capacity. She was also experiencing migratory arthralgia particularly in her knees. She has mild ankle edema. On exam Dr. Jemsek notes moderate and significant head and neck neuro-irritability with pain at C2 bilaterally and tightness at the trapezius muscles. Dr. Jemsek felt that Sharon was doing well and could stay on maintenance. Dr. Jemsek notes that Dr. Gilbert's cardiac issues remain stable. |
| 103 – 115 | Dr. Gilbert returned to see Dr. Mangat on February 27, 2020 due to worsening symptoms of short-term memory with word amnesia and worsening multitasking. Due to numbness and nerve pain Dr. Mangat recommended MRI's of the orbit and brain which were performed on March 19, 2020 **(pgs. 87-91)**. Among the findings included "multiple small foci of increased T2 flair ranging from 2 mm – 3 mm in size, involving deep white matter, bilateral cerebral hemispheres. There are approximately 3-4 lesions on each side… inflammatory/infectious disorder or small vessel vasculopathy."<br><br>Dr. Gilbert returned on March 24, 2020 and Dr. Mangat diagnosed Encephalopathy. This is consistent with Dr. Jemsek's subsequent referral to Dr. Shostak for a neuropsychological evaluation. |
| 30 – 31 | Dr. Gilbert returned to see Dr. Jemsek on March 10, 2020 who stated the following:<br><br>*Sharon is a long term patient, who is on disability with Social Security and simply unable to work for the last 2-3 years as a Biostatistician. The complications that led to this are well documented and include prominent decline in cognitive function, major decline in fatigue and at one point or another, she was having significant neuropathic pain, including cervical plexitis.*<br><br>Therefore, Dr. Jemsek noted that "patient is a candidate for psychometric evaluation – refer to Dr. Shostak in Springfield." |
| 92 – 102 | On April 6, 2020 Dr. Gilbert was evaluated by Dr. David Shostak, a clinical psychologist. Dr. Shostak's interpretations include the following:<br><br>*Dr. Gilbert certainly does present some significant impairments in her neurocognition. The distribution of her findings across measures were quite fully consistent with her own observations of her problematic cognition and reports and her husband's observations as well.*<br><br>*Reviews of the neuropsychological literature concerning neuropsychological functioning in chronic Lyme disease are generally consistent with the deficits that can be seen in processes with primary frontal CNS systems involvement.* |

> *Dr. Gilbert's findings certainly suggest an anterior (frontal) concentration of her impairments.*
>
> *... Dr. Gilbert's neurocognitive deficits by contrast, are relatively specific, and attributable to some frontal CNS mechanisms (they are consistent in fact with the dynamic MRI and SPECT imaging research demonstrating a frontal hypofunction in Lyme disease patients).*

Dr. Shostak provided an example of Dr. Gilbert's breakdown between directed task attention and working memory as follows:

> *One example of the breakdown between externally directed task attention and working memory was seen in Dr. Gilbert's performance on a time representation task. She managed to sustain her attention in an uninterrupted and relevant way on this task (and on others). While sustaining her attention and the relevant "set", she could not concurrently integrate working memory information that would internally update her attention to the external aspects of the problem task (i.e. while attending to the clock-face she had drawn, she could not recall the spatial representation of the times).*
>
> *She relied on a verbal-mediated strategy exclusively (recalling semantic memory associations regarding the rules concerning the placement of the two separate hands) as opposed to directly integrating the two dimensional working memory for the familiar image of her times 4:35 or 9:10. She was insensitive to the spatially coded features, misplacing the minute hand 'halfway' between 6 and 7 for example, while constructing 4:35 and drawing the hour hand as the longer of the two.*
>
> *A similar phenomenon was seen in her response to the Rey Complex Figures Task. She was presented a complex perceptual design and was asked to copy it. She was a bit overwhelmed by the stimulus complexity of the design. She used her index finger to narrow down a particular segment of the design that she was copying. However, she did accurately copy the entirety of the design. Restating, her externally directed attention (and motor response) to the task was well sustained and uninterrupted.*

On the WAIS-IV, Dr. Shostak noted that Dr. Gilbert showed select impairments in the integrative function of externally directed attention and working memory.

In further testing Dr. Shostak noted lower scores on perceptional reasoning and difficulty with working memory. In fact, Dr. Shostak stated that "Dr. Gilbert's performance on the working memory subtest pretty directly captures the difficulties she has (in the functional coupling of her externally directed attention and the domains of her working memory)." Dr. Shostak reported that Dr. Gilbert had considerable difficulty with the subtest.

In evaluating Dr. Gilbert's personality, Dr. Shostak also found, consistent with the

12

| | |
|---|---|
| | opinions of Dr. Jemsek, that Dr. Gilbert continued to push herself as her health was declining. Dr. Shostak stated the following:<br><br>*Her identity largely revolves around the consideration of an acceptable self that rests upon a determined and achievement directed pursuit of external goals and tasks in her environment, and a response to goal obstruction that is characterized by renewed volleys of determined effort that are designed to surpass the obstruction.*<br><br>*This dynamic served her well for the most part throughout her premorbid development. It was probably more of a pathogenic factor post-morbidly. She undoubtedly pushed herself at work as her health was declining, seeing (understandably) that getting the work done and holding down her position. The compensatory energy she had to devote to staying lucid and functional progressively exhausted her and rendered her still more symptomatic.*<br><br>*She reached a point of patent symptom breakdown before her task directed mind and acceptable identity could no longer minimize the reality of a soma that was breaking down on her, nor what the self was no longer able to manage by way of intensifying pain, exhaustion and cognitive impairments.* ***She certainly is work disabled.*** (emphasis added) |
| 116 – 123 | Dr. Gilbert's records were reviewed by a vocational consultant, Martin Kranitz. Mr. Kranitz's evaluation and CV are attached. Mr. Kranitz had an opportunity to review Principal's denial, as well as Principal's various medical reviews. Mr. Kranitz also reviewed multiple medical reports concerning the treatment of Dr. Gilbert, as well as her job description, resume and Social Security decision. Mr. Kranitz determined that Dr. Gilbert is unable to perform the material and substantial duties of her occupation as a Biostatistician as of September 11, 2018 when she ceased work. Mr. Kranitz expressed the following opinions:<br><br>*The work of Biostatistician, is a highly sophisticated job requiring cognitive skills at many levels (see job description above by way of example). During the psychological evaluation by Dr. Shostak, Dr. Gilbert could not draw the hands of a clock to indicate a specific time, nor draw nor list the names of states along the eastern seaboard nor do simple mathematical calculations.*<br><br>*While Dr. Gilbert may not meet the exact requirements for a diagnosis of Lyme disease as defined by the CDC, it is quite clear that her treating physician (Dr. Jemsek) believes her symptoms are related to Lyme disease and is treating her as best he can (with apparently no great improvement in Dr. Gilbert's symptoms).*<br><br>*Given an individual who is unable to perform tasks described in Dr. Shostak's report, it is my opinion that such an individual would be unable to perform the job, tasks and responsibilities of a biostatistician that is directly related to the FDA and the approval of various drugs, which if done incorrectly could have a* |

> *devastating effect on the users of said drugs.*
>
> *It is my opinion, after reviewing all of the medical documentation that Dr. Gilbert is unable to perform the material and substantial duties of her prior occupation as a Biostatistician as it is performed in the national economy as of 9/11/18 when she ceased work.*
>
> *Parenthetically, it should be pointed out that the Social Security Administration has awarded disability benefits as of 9/11/18 as well. While the guidelines for disability may be different, it is important to note that they found Dr. Gilbert credible in her limitations.*

### E. Conclusion

It is submitted that the aforesaid documentation, along with the documentation already contained in the Administrative Record, fully supports Dr. Gilbert's claim that she is unable to perform the material and substantial duties of her own occupation as a Biostatistician, as it is routinely performed for the employer, or in the national economy, or for that matter, any occupation. Consequently, Principal's decision to deny benefits to Dr. Gilbert was arbitrary and unreasonable, and not based upon substantial evidence in view of this supporting documentation. Furthermore, Principal has failed to conduct a full and fair review and is therefore urged to reverse its decision.

With that in mind, the STD and LTD benefits due Dr. Gilbert are calculated as follows:

**STD**
9/18/18 – 12/10/18 (12 weeks) @ $ 1,913.00 per week (70% pre-disability earnings) = $22,956.00

**LTD**
12/11/18 – 3/10/19 (3 months) @ $ 7,105.00 per month (60% pre-disability earnings) = $21,315.00

3/11/19 – 6/11/2020 (15 months) @ $ 4,619.00 per month (benefit after SSD offset) = $69,285.00

**Total benefits due: $ 113,556.00**

Benefits continue at the rate of $ 4,619.00 per month subject to the terms and conditions of the Principal plan.

In view of the above, we look forward to Principal's prompt review of this appeal. If you have any questions please do not hesitate to contact me.

Thank you for your anticipated cooperation.

Very truly yours,

Keith R. Siskind

Enclosures
cc: Sharon Gilbert