## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

SHARON GILBERT,

     Plaintiff,

     v.

PRINCIPAL LIFE INSURANCE
COMPANY,

     Defendant.

Civil Action No. TDC-21-0128

## MEMORANDUM OPINION

Plaintiff Sharon Gilbert, a biostatistician with a Ph.D. in Epidemiology, sought long-term disability benefits under the employee welfare benefit plan provided by her employer, Tunnell Consulting, Inc. ("Tunnell"), and administered by Defendant Principal Life Insurance Company ("Principal"). Gilbert, who was diagnosed with Lyme disease in May 2016, ceased working on September 10, 2018 due to a range of symptoms including fatigue, headaches, chills, chest pain, joint pain, numbness, and nausea. Gilbert's claim and appeal were denied by Principal. Then, after a second appeal, Gilbert was approved for benefits on the grounds that she had a disability based on a mental health condition, but such a determination limited her to a maximum of 24 months of benefits. After the second appeal, Gilbert filed this action against Principal under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461 (2018).

Pending before the Court are Cross Motions for Judgment on the Administrative Record under Federal Rule of Civil Procedure 52(a), which have been fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. Because the Motions are filed under Rule 52(a), the Court is required to make findings of fact and

conclusions of law, which are set forth below.  Fed. R. Civ. P. 52(a); *see also Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 980 (E.D. Va. 2005).  For the following reasons, Principal's Motion will be granted, and Gilbert's Motion will be denied.

## FINDINGS OF FACT

Gilbert was employed by Tunnell as a biostatistician from November 17, 2015 until September 10, 2018.  Her duties included "the statistical analysis of new technology testing data to include such tasks as development or review of clinical protocols for size, power, data capture, and planning; interim review analysis, final data analysis, and coordination with project managers, regulatory affairs, and clinical support sections."  Administrative Record ("AR") 490, ECF Nos. 36–38.  Though she primarily worked from home, Gilbert's role also required visits to client sites and occasional visits to the Tunnell office in Bethesda, Maryland or the Tunnell corporate headquarters in Pennsylvania.

## I.    The Plan

As part of her employment terms, Gilbert was eligible for benefits, including long-term disability ("LTD") benefits, under a group insurance plan ("the Plan") administered by Principal. The Plan provides that if a beneficiary meets the criteria for long-term disability under the terms of the Plan, there is a Primary Monthly Benefit of 60 percent of a beneficiary's pre-disability earnings.  Specifically, a beneficiary is considered disabled "if, solely and directly because of sickness, injury, or pregnancy" and during the first 90 days of disability or the first two years after that 90-day period, "one of the following applies":

     a.     You cannot perform the majority of the Substantial and Material Duties of your Own Occupation.

     b.     You are performing the duties of your Own Occupation on a Modified Basis or any occupation and are unable to earn more than 80% of your Indexed Predisability Earnings.

AR 6109.

A beneficiary also qualifies as disabled if after those time periods, "one of the following applies":

a.    You cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which you are or may reasonably become qualified based on education, training, or experience.

b.    You are performing the Substantial and Material Duties of your Own Occupation or any occupation on a Modified Basis and are unable to earn more than 60% of your Indexed Predisability Earnings.

*Id.* To qualify for benefits, a participant's disability also must be "not subject to any of the Limitations" listed in the Plan. AR 6109. One of the limitations states that, "[w]hen Disability results from ... a Mental Health Condition or a Special Condition, the maximum number of Benefits Payable for all such periods of Disability is limited to 24 months." AR 6121.

Under the Plan, a Mental Health Condition is "[a]ny condition which is: (a) manifested by a psychiatric disturbance including, but not limited to, a biologically or chemically based disorder; and (b) categorized in the current edition of the American Psychiatric Associations Diagnostic and Statistical Manual of Mental Disorders." AR 6134. A Special Condition is defined as a number of specific conditions, including headaches, chronic fatigue syndrome, fibromyalgia, and musculoskeletal and connective tissue disorders. The 24-month limitation does not apply if a participant has "other conditions which, in the absence of the [Mental Health Condition or Special Condition], would continue to exist, limit activities and lead [the Plan] to conclude that you are Disabled for another condition in and of itself." AR 6121.

## II.    Initial Determination

Gilbert filed a claim for benefits on September 12, 2018, asserting that she was unable to work due to "[a]dvanced and disseminated Lyme Borreliosis Complex," with which she was

3

diagnosed in 2016. AR 299. Gilbert included with her claim an Attending Physician Statement and medical records from her physician, Dr. Joseph Jemsek of Jemsek Specialty Clinic in Washington, D.C., who is board certified in internal medicine and infectious disease. Dr. Jemsek reported that Gilbert suffers from "severe, persistent, debilitating fatigue; as well as profound and post-exertional fatigue; dysautonomia with labile blood pressures; temperature dysregulation; frequent fevers; sweats; dysesthesias; joint and muscle pain; frequent severe headaches" and that "symptoms increase exponentially with activity, driving, and with over stress." AR 299. Dr. Jemsek also reported that "[t]here is considerable risk for continued clinical decline if [Gilbert] continues working against medical advice." AR 299.

In his notes from Gilbert's medical appointment on September 1, 2016, Dr. Jemsek stated that Gilbert has "Lyme borreliosis complex by history and positive Lyme serology ... through Lab Corp Western Blot, Lyme IgG positive 41 and 18, IgM positive 23." AR 724–25. Dr. Jemsek further noted that Gilbert "never had a tick bite that she knows of" and "never had a bullseye rash," but that she "has done a lot of outdoor activities in the past, [and] has seen ticks in her bed and on her dog," so "a tick attachment could have been possible." AR 722, 725.

Following that diagnosis, Dr. Jemsek placed Gilbert on a "rigorous" treatment program consisting of multiple four-week cycles of antibiotics including cefdinir alternated with ciprofloxacin, minocycline, rifabutin, metronidazole, and fluconazole. AR 385. As of August 27, 2018, Gilbert was taking 19 different medications "as a necessary component" of Dr. Jemsek's treatment program. AR 301. In an August 14, 2018 letter expressing the opinion that Gilbert should receive medical disability benefits, Dr. Jemsek stated that Gilbert was continuing to experience "considerable symptomatology" and that her health issues were both distressing and greatly limiting her overall functionality, including her physical and mental stamina, endurance,

4

and concentration, and that her condition had come to a point where "she cannot sustain work activity in any capacity on a sustained, consistent, and predictable basis." AR 441. Based on this guidance from Dr. Jemsek, Gilbert stopped working on September 10, 2018.

After receiving Gilbert's claim, Principal referred Gilbert for an independent medical evaluation ("IME") by Dr. Ross Myerson, Medical Director of Occupational and Environmental Health at MedStar Washington Hospital Center in Washington, D.C., who is board certified in occupational medicine. The IME, during which Dr. Myerson examined Gilbert in person and reviewed her medical records, occurred on December 4, 2018. In his report, Dr. Meyerson asserted that the physical examination was unremarkable and that Gilbert "has numerous somatic complaints" but that "[t]here is no objective evidence that Ms. Gilbert currently has or ever has had Lyme Disease or Bab[e]sia." AR 391. Dr. Meyerson also stated that he does not believe that Dr. Jemsek's diagnosis is supported by "evidence-based medicine." AR 392. Specifically, he concluded that "the treatments protocols she has been participating in"—referring to Dr. Jemsek's treatment—"are not necessary and are not effective in treating any condition supported by objective medical evidence." AR 391. Dr. Meyerson concluded that Gilbert's complaints "are unsupported by the medical records and physical examination" and "are likely functional in nature (psychological)." AR 392–93. He further opined that she "likely has a somatization syndrome; however, a psychiatrist would be more qualified to render a diagnosis." AR 392. Based on his evaluation, Dr. Myerson did not find that Gilbert had any restrictions or limitations on her ability to work. AR 392.

Principal also retained Dr. Jennifer Hanrahan, D.O. of MetroHealth Medical Center in Cleveland, Ohio, who is board certified in internal medicine and infectious diseases, to conduct a review of Gilbert's medical files on December 28, 2018. In performing the file review, Dr.

5

Hanrahan reviewed Gilbert's medical records, reviewed Dr. Meyerson's IME, and attempted to interview Dr. Jemsek before ultimately speaking with a physician's assistant in Dr. Jemsek's office about Gilbert's condition and the care she received. Based on this information, Dr. Hanrahan concluded that Gilbert's Lyme disease diagnosis was not supported by the medical documentation or the standards established by the Centers for Disease Control and Prevention ("CDC"). Specifically, Dr. Hanrahan reported that the results of a blood test detecting antibody response showed that Gilbert had two positive "bands" relating to immunoglobin G (" IgG") and one relating to immunoglobin M ("IgM"), while the CDC requires five out of ten bands to be positive to support a diagnosis of Lyme disease. AR 408. Dr. Hanrahan also asserted that Gilbert's treatment regimen is an "alternative treatment for Lyme disease," and that her "[m]ultiple courses of antibiotics are not recommended and have no documented efficacy." AR 409. Although Dr. Hanrahan acknowledged that Gilbert was experiencing symptoms including pain, difficulty sleeping, anxiety, and night sweats and may have "other medical problems," AR 409–11, she concluded that there was "no evidence of impairment" from an infectious disease that would prevent her from doing her job. AR 408.

Based on the opinions of Dr. Meyerson and Dr. Hanrahan, Principal called Gilbert on January 3, 2019 and asked if she was receiving mental health treatment. Gilbert stated that she was seeing a psychologist once a month because of the difficulty of managing her symptoms. Considering all of the medical records and opinions, as well as conversations with Gilbert and her employer, Principal determined that there were not "any specific restrictions or limitations preventing [Gilbert] from performing" her job and denied her claim for LTD benefits on January 9, 2019. AR 101–02.

6

### III.   First Appeal

#### A.   Gilbert's Evidence

On June 28, 2019, Gilbert filed an appeal of Principal's denial of benefits.  In her appeal, Gilbert argued that Principal wrongly relied on the CDC testing definition for Lyme disease because a doctor's clinical judgment should be factored into any Lyme disease diagnosis and test results should be interpreted in "the context of a patient's clinical history."  AR 114.  Gilbert acknowledged that while she has never seen a tick bite or rash on her body, she was an "avid hiker" and that, in June 2011, had woken up during a vacation in Saratoga, New York with "20 or more ticks on [her] bed," so attachment by a tick was possible.  AR 115–16, 139.  Gilbert further stated that within months after that incident, she passed out while jogging and began to have health issues, including varying blood pressure, gastrointestinal problems, migratory chest pain, day and night sweats, and a pulmonary embolism.  Despite her symptoms, she was unable to obtain treatment for Lyme disease because her test results did not meet the CDC standards until May 2016, when she was diagnosed by her internist, Dr. Harpal Mangat of Clarksburg Medical Center in Clarksburg, Maryland, based on her symptoms and the fact that several other health conditions had been ruled out by other physicians.  After four months of antibiotic treatment under Dr. Mangat, Gilbert continued to have some of the same symptoms so in September 2016, she sought treatment from Dr. Jemsek, who specializes in Lyme disease patients with persistent symptoms. According to Gilbert, despite 18 months of antibiotic treatment with Dr. Jemsek, her health continued to decline, and Dr. Jemsek found that she had autonomic nervous dysfunction, burning and swelling in her legs, intermittent tingling and numbness in her hands and feet, head pressure, chest pain, inconsistent blood pressure, flu-like symptoms, sleep disturbances, and cognitive problems.  She thus had "severe difficulties" performing her job duties in 2018. AR 117.  She also

reported that pursuant to its rules, the Social Security Administration ("SSA") had found her to be disabled as of September 11, 2018 and would provide monthly disability benefits starting in March 2019. AR 117.

Along with her appeal letter, Gilbert submitted supporting documentation relating to the SSA determination. The SSA's Disability Determination Explanation found that the severity of Gilbert's reported symptoms of pain, malaise, weakness, fatigue, memory limitations, and concentration limitations was not substantiated by objective medical evidence alone, but it found her disabled because it gave "significant credence" to Dr. Jemsek and his diagnosis of chronic Lyme disease based on the "long-standing doctor-patient relationship" and "the longitudinal records." AR 712–19.

Gilbert also provided documentation of additional examinations and treatment by several doctors, including additional clinical notes, letters, and test results from Dr. Jemsek; a letter of support sent to SSA by Dr. Amanda Skowren, a licensed clinical psychologist; medical records from two neurologists, Dr. David Taragin of the Neurology Center in Silver Spring, Maryland and Dr. Michael Sirdofsky of MedStar Health in Washington, D.C.; medical notes from her cardiologist, Dr. Joann Urquhart of Adventist Healthcare in Rockville, Maryland. Dr. Jemsek's notes reflected that as of March 26, 2019, Gilbert's condition had taken a "significant downturn" since a November 2018 visit. AR 447. In a May 28, 2019 letter, Dr. Jemsek reported that Gilbert was experiencing continuing fatigue, chest pain, headaches, nerve pain, and other symptoms.

As to the neurologists, Gilbert submitted records from February 12 and February 19, 2019 visits with Dr. Taragin and a report by Dr. Sirdofsky from a March 18, 2019 office visit. During the February 12 office visit, Dr. Taragin took note of Gilbert's symptoms of "numbness and paresthesias of the legs as well as a burning pain in the legs and calves and chest and arms." AR

8

565.    For the numbness and tingling sensations in her skin, Dr. Taragin ordered an electromyography ("EMG") test to assess the health of her muscles and nerves, which had normal results.  Regarding her headaches, his neurologic examination had normal results.  He noted that while Gilbert had been treated with antibiotics for two and a half years for "presumed Lyme" disease and was seeing a "Lyme specialist," there was "no clear evidence that she has neurologic or systemic Lyme disease."  AR 565, 568.  He reported that she was evaluated in his office in the past for similar symptoms, "but after an extensive workup, nothing was found."  AR 565.  Instead, he stated his concern "about the use of foreign biotics for such a long time which may be in fact causing her symptoms" and suggested that she discontinue the antibiotics that have not been helpful.  AR 568.  Dr. Taragin also recommended that Gilbert see an infectious diseases specialist at Johns Hopkins.

The second neurologist, Dr. Sirdofsky, examined Gilbert on March 18, 2019 and, based on Gilbert's report of pain, numbness, and tingling, recommended blood work and a skin biopsy to assess whether she had small fiber neuropathy.  Regarding Lyme disease, Dr. Sirdofsky concluded that while Gilbert had been receiving antibiotic treatment for Lyme disease for two and a half years "possibly without end," she "never had a Lyme rash or clear-cut Lyme arthritis or Lyme meningitis," and her current positive IgM result was "likely a false positive."  AR 561, 563.

Following Dr. Taragin's advice, Gilbert saw Dr. Maryana Shenderov, an infectious disease physician on the faculty at the Johns Hopkins University School of Medicine, on April 16, 2019.  Although she acknowledged that Gilbert had been receiving antibiotic treatment for Lyme disease through Dr. Jemsek, Dr. Shenderov stated in her report that Gilbert's serology test results were negative and that her symptoms are not consistent with meningitis or neuro-Lyme, but noted that they "could fit post-treatment Lyme disease syndrome."  AR 595.  Dr. Shenderov also stated that

9

Gilbert "may not have had Lyme at all" but "has had more than enough doxycycline to cure Lyme and other tick borne illnesses." AR 595. Regarding Gilbert's symptoms, Dr. Shenderov observed that they "suggest nerve like discomfort but no neurological or rheumatological signs or red flag symptoms at all," which was "all good news." AR 595. Dr. Shenderov also noted that Gilbert's prior fevers while taking medications could have been drug fevers, and "emphasized [to Gilbert] the lack of benefit or indication of the antimicrobials vs the real risks of harm, including neuropathic side effects" that can occur with long term use. AR 595. Ultimately, after a 90-minute visit, Dr. Shenderov recommended that Gilbert "stop the unwarranted antimicrobials and supplements" provided by Dr. Jemsek and "then see what symptoms still remain and require workup." AR 595.

As for the cardiologist, Gilbert submitted a report from Dr. Urquhart, who had prescribed medication to Gilbert for heart arrhythmias and had a follow-up visit with her on May 28, 2019. Dr. Urquhart reported that Gilbert's stress test had normal results and her blood pressure had been elevated but was stable during the visit. She also determined that during a 14-day period of cardiac monitoring, Gilbert had two supraventricular tachycardia ("SVT") runs, consisting of periods of rapid heartbeats, the longest of which lasted 20 heartbeats. Dr. Urquhart stated that "[h]er palpitations are controlled on her current medication regimen" but recommended a higher dosage of magnesium. AR 465, 469. Dr. Urquhart also noted in her report that in light of Gilbert's prior diagnosis of Lyme disease, the high heart rate might have been caused by the Lyme disease, and that her continued treatment for chronic Lyme disease may be accounting for her reported chest discomfort.

10

## B. Principal's Evidence

Upon reviewing Gilbert's appeal, Principal referred Gilbert to Dr. Phillip Kempf, the Medical Examiner of Virginia and the President of the Arthritis Clinic of Northern Virginia, who is board certified in rheumatology, for an in-person IME on October 16, 2019. Based on his review of Gilbert's medical records and the in-person examination, Dr. Kempf found no clinical or serologic evidence to support a Lyme disease diagnosis, that the diagnosis was not supported by CDC guidelines, and that Gilbert was not receiving appropriate treatment and should see other physicians for her subjective complaints. Because Gilbert was taking so many medications, he could not comment on potential side effects or functionality. He stated that Gilbert had no physical impairments from a rheumatological standpoint that would affect her functionality or ability to work full-time, but that she "has a multitude of subjective symptoms," including headaches, chest pain, and fatigue, that have impacted her and that she was not improperly magnifying. AR 577.

Principal also engaged Dr. Jason Wirtz of St. Paul Infectious Diseases Associates in Maplewood, Minnesota, who is board certified in infectious diseases, to conduct a review of Gilbert's medical files on December 12, 2019. In conjunction with this review, Dr. Wirtz called Dr. Jemsek's office five times and left five messages, but was never able to speak to a physician. After reviewing Gilbert's medical records, visit notes, and tests, Dr. Wirtz concluded that the medical and clinical data were not consistent with Lyme disease, nor were there objective findings at any stage of Lyme disease, which according to Dr. Wirtz is diagnosed based on laboratory results rather than symptoms. He therefore stated that the standard of care did not support ongoing treatment indefinitely for Lyme disease and he agreed with Dr. Shenderov's recommendation that Gilbert should not take further antibiotics. Dr. Wirtz concluded that Gilbert did not have an

infectious disease that prevented her from performing unrestricted work on a full time basis from September 2018 forward.

Gilbert was provided with the evaluations by Dr. Kempf and Dr. Wirtz. On January 15, 2020, she sent a letter to Principal arguing that their evaluations improperly focused on the CDC criteria for Lyme disease, which she asserts were not designed for "clinical assessment," and ignored her other issues, including her autonomic nervous system dysfunction and fatigue. AR 611, 615. She provided additional medical notes from office visits to Dr. Jemsek on July 23, 2019 and December 3, 2019, which Dr. Wirtz reviewed before reiterating his original assessment on January 29, 2020.

Principal then obtained an additional medical file review from an internal medicine perspective by Dr. Evan Li of Baylor College of Medicine in Houston, Texas, who is board certified in internal medicine and allergy and immunology. In his February 11, 2020 report, Dr. Li found that Gilbert's symptoms "have been inappropriately attributed to Lyme disease" and that Dr. Jemsek's medication regimen is not the standard of care for Lyme or any other condition. He therefore concluded that "no conditions supported by the records" explained her symptoms of "pain, fatigue, malaise, cognitive dysfunction, and burning in her hands and feet, and chest pains." AR 636. He further concluded that "it is not apparent from the records" that her SVT arrythmia issues were impairing and that they "cannot explain her symptoms of fatigue." AR 636–37. He also found no information in her medical records supporting a diagnosis of autonomic dysfunction and that she had not received a formal work-up to determine if she has that disorder. Ultimately, Dr. Li opined that Gilbert's symptoms "may be explained by a somatoform disorder, fibromyalgia or chronic fatigue syndrome," AR 639, but he nevertheless asserted that based on the records, "[it]

does not appear that the level of fatigue [she] has reported is impairing her overall day to day functionality" and that she could work full time without restrictions.  AR 637, 639.

On February 12, 2020, Principal denied Gilbert's appeal and upheld its denial of Gilbert's claims.  Principal informed Gilbert by letter that it had concluded that she did not have any condition that would prevent her from performing her job, so she did not meet the definition of disability required for benefits.  Principal noted that while its determination differed from that of the SSA, the SSA's decision was based on medical records available as of November 11, 2019 and did not include the "additional, newer information" provided by the IME and medical file reviews.

IV.    **Second Appeal**

Gilbert then retained an attorney, who requested an additional, voluntary appeal on March 10, 2020.  On June 3, 2020, Gilbert submitted a letter with additional information supporting her second appeal in which she argued, in part, that Principal improperly required "objective proof" of disability, which is not required by the Plan.  AR 673.  With her letter, Gilbert provided notes from a March 23, 2020 Medical Assessment of Ability to Do Work-Related Activities conducted by Dr. Jemsek, who concluded based on the assessment that Gilbert was limited to sitting on average 20–30 minutes at one time and no more than 1.5 hours during an eight-hour day and that she has other impairments including brain fog or cognitive impairment.  AR 752–55.

Gilbert submitted results from a March 5, 2020 skin biopsy that found "[a]bnormal intraepidermal nerve fiber density... consistent with a neuropathy affecting small nerve fibers." AR 796.  Her submission also included records from a March 24, 2020 visit with Dr. Mangat, who originally diagnosed her with Lyme disease in May 2016, in which Dr. Mangat stated that an "MRI confirms multiple small lesions in the deep white matter of both cerebral hemispheres" and "shows

diffuse enhancement along the optic nerve sheaths." AR 1036. Dr. Mangat diagnosed "unspecified" encephalopathy. AR 1037.

As part of the second appeal, Gilbert also submitted an April 6, 2020 evaluation by Dr. David Shostak, a clinical psychologist based in Springfield, Virginia, to whom she had been referred by Dr. Jemsek. After noting that Dr. Jemsek had diagnosed Gilbert with Lyme disease that has resulted in symptoms such as extreme malaise and fatigue, widespread pain, and chills and sweats, Dr. Shostak found "significant impairments in [Gilbert's] neuro-cognition," stated that "it is not surprising that recent brain MRI has shown some bilateral lesions" based on her deficits, asserted that she appeared "besieged with pain," and concluded that "[s]he certainly is work disabled." AR 807, 813.

The additional information included a questionnaire completed by Gilbert's primary care physician, Dr. Lisa Ng of Olney, Maryland, who had concluded that as of April 27, 2020, Gilbert remained totally disabled and unable to work because of her headaches, fatigue, neuropathy, joint pain, chest pain, back pain, temperature instability, labile blood pressure, and drowsiness. Gilbert also submitted a May 18, 2020 review by Martin Kranitz, a vocational consultant in Annapolis, Maryland, who asserted that Gilbert would be unable to perform her job based on the medical records he reviewed.

Gilbert separately provided written responses to questions posed by Principal, in which she described each of her conditions and symptoms, the treatment she was receiving, and the impact of her conditions, including the disruption to her daily routine and her inability to sit for long periods or to engage in ordinary activities such as travel, household chores, and shopping.

To address the second appeal, Principal obtained additional evaluations, beginning with a file review by Dr. Michael Raymond, Ph.D. of Drums, Pennsylvania, who is board certified in

14

neuropsychology, on July 16, 2020. Based on that review, Dr. Raymond stated that "there is a dearth of objective evidence to support any degree of neuropsychological dysfunction that would result in impairment or associated limitations or restrictions." AR 922. Regarding Dr. Shostak's evaluation, Dr. Raymond stated that it "must be viewed cautiously, and with all due respect, is essentially uninterpretable from a neurodiagnostic perspective." AR 927. Specifically, Dr. Raymond asserted that the evaluation was a "cursory and nonstandardized psychological as opposed to neuropsychological evaluation," that there "was no administration of symptom or performance validity tests," that "IQs were not calculated in a standardized fashion, and the content of the report would not enable a well-trained clinician to render an opinion with any degree of neuropsychological certainty." AR 927. Dr. Raymond further stated that all of Gilbert's neurological evaluations, mental status evaluations, and neuroimaging, including the MRI, were "negative and nondiagnostic." AR 927. Dr. Raymond therefore found no neuropsychological basis for any restrictions or impairments on Gilbert's activities. On August 5, 2020, after reviewing raw data from Dr. Shostak, Dr. Raymond submitted an addendum to Principal reaffirming his findings.

On July 23, 2020, Dr. Keith Stowell of Western Psychiatric Hospital in Pittsburgh, Pennsylvania, who is board certified in general, forensic, and geriatric psychology, conducted an IME of Gilbert at the request of Principal. Based on the IME, and the results of tests conducted that day, Dr. Stowell diagnosed Gilbert with Somatic Symptom Disorder ("SSD") and Unspecified Depressive Disorder and concluded that her physical symptoms were "causing disruption in daily life" and that her psychiatric symptoms were "functionally impairing with a resultant inability to provide sustained attention to projects, provide adequate focus to needs of others, or sit for extended periods of time." AR 1002–04.

On August 14, 2020, Principal overturned its earlier determinations and approved Gilbert's claim for LTD benefits because it concluded that she is unable to work due to a mental health condition, which is subject to the 24-month limitation under the Plan.  As part of ongoing efforts to determine whether Gilbert had any other conditions which were preventing her from working, Principal arranged for an additional medical file review by Dr. Mostafa Farache of Duluth, Minnesota, who is board certified in neurology, psychiatry, and neurophysiology.  In a November 20, 2020 report, Dr. Farache stated that Gilbert's neurological examination and EMG results were normal, and that the enhancement of her optic and facial nerve shown in her MRI was "likely related to the excessive unwarranted use of antibiotics as tetracyclines are known to cause cranial nerve toxicity."  AR 286.  Although he acknowledged that Gilbert's skin biopsy showed small fiber neuropathy, he noted that it is not an impairing neurological disease and can be managed through pain medication.  Dr. Farache reported that he spoke with Dr. Taragin, who agreed that Gilbert's small fiber neuropathy would not be considered impairing.  He concluded that there were "no neurological diagnoses impairing [Gilbert's] functionality" and that a somatization disorder appeared to be the cause of Gilbert's symptoms and the adverse effects on her functionality.  AR 287.

In a September 23, 2020 letter, Dr. Shostak disagreed with Dr. Stowell's findings and argued that Gilbert's impairments "were neither somatic in nature nor psychiatric related."  AR 1038.  Rather, he asserted that Gilbert "showed impairments in the mechanisms involved in specific and crucial areas of her neurocognition" that would "be apparent in the form of memory neglect" such as "failing to recall what she had for lunch two hours ago" but would not be "very apparent" in clinical interview.  AR 1038.  Dr. Shostak emphasized that "the cognitive symptoms Dr. Gilbert presents were highly consistent with the construct of a Lyme encephalopathy."  AR

1038. Dr. Shostak also found the SSD diagnosis inappropriate given the documented severity of Gilbert's symptoms. While Dr. Shostak agreed with Dr. Stowell that "there are some significant emotional aspects of Ms. Gilbert's situation that are by themselves work disabling," he asserted that those factors are secondary to "the debilitating impact of her disease processes and her (work impairing) neurocognitive deficits in association with a Lyme encephalopathy." AR 1040.

In its final denial of the second appeal on December 3, 2020, Principal concluded that Gilbert's physical conditions were not of sufficient severity to be functionally disabling. Having exhausted all administrative remedies, Gilbert filed this lawsuit.

## CONCLUSIONS OF LAW

In her Motion seeking judgment in her favor, Gilbert argues that the administrative record demonstrates that she has proven that she qualifies for long-term disability benefits and that Principal is improperly ignoring ample medical evidence demonstrating that she has physical conditions that prevent her from being able to work. In particular, she argues that the record evidence establishes that her symptoms causing her disability are traceable to Lyme disease she contracted as early as 2011 and with which she was diagnosed in 2016, as opposed to a mental health condition such as SSD. She further argues that even if her disability is traceable in part to a mental health condition, she has ample "other conditions" not subject to that limitation that render her disabled. AR 6082.

In its Motion seeking judgment in its favor, Principal argues that the record evidence refutes the claim that Gilbert's disability is traceable to Lyme disease and that it instead derives from a Mental Health Condition, specifically SSD, for which there is a limit to benefits of 24 months. Principal further argues that her allegedly disabling symptoms or conditions constitute Special Conditions, as defined in the Plan, that are also subject to the 24-month limitation. Finally,

17

Principal argues that any other conditions not subject to this limitation are not severe enough to prevent her from working so as to render her eligible for LTD benefits.

## I.      Legal Standard

ERISA provides that an employee benefit plan participant or beneficiary may bring a civil action "to recover benefits due . . . under the terms of [the] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In conducting a review pursuant to this provision of a plan administrator's denial of benefits, a district court is to apply a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case an abuse of discretion standard is applied. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 269–30 (4th Cir. 2010). The insurance plan at issue in this case provides that "Principal has complete discretion to construe or interpret the provisions of this group insurance policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided." AR 6054. However, *de novo* review is still appropriate here because Maryland law bars such discretionary clauses in insurance policies. Specifically:

> A disability insurance policy may not be sold, delivered, or issued for delivery in the State by a carrier if the policy contains a clause that purports to reserve sole discretion to the carrier to interpret the terms of the policy or to provide standards of interpretation or review that are inconsistent with the laws of the State.

Md. Code Ann., Ins. § 12-211(b) (LexisNexis 2017). Section 12-211(b) serves to "guarantee *de novo* review" of a decision to deny benefits under § 1132(a)(1)(B), even when the policy contains a provision conferring sole discretion to the principal. *See Weisner v. Liberty Life Assurance Co. of Bos.*, 192 F. Supp. 3d 601, 613 (D. Md. 2016) (stating that *de novo* review was necessary to

18

"level[] the playing field for consumers who are otherwise substantially at the mercy of insurer-administrators"); *see also Mantica v. Unum Life Ins. Co. of Am.*, No. RDB-18-0632, 2019 WL 1129438, at *6–7 (D. Md. Mar. 12, 2019) (following *Weisner* and applying the *de novo* standard in light of section 12-211 to a decision made under a plan granting discretionary authority to the plan administrator). Relying on *Weisner*, both Gilbert and Principal agree that a *de novo* standard of review applies here.

When conducting *de novo* review, a court makes an "independent determination" of whether the plaintiff was entitled to the requested benefits. *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013). In doing so, the Court determines "[t]he correctness, not the reasonableness" of the denial of benefits, *id.*, and should consider the issue "as if it had not been decided previously." *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992); *Neumann*, 367 F. Supp. 2d at 988 (under a *de novo* standard, considering whether the plaintiff was entitled to disability benefits "as if it had not been decided previously").

Gilbert has the burden to prove that she is entitled to benefits under the Plan. *See Band v. Paul Revere Life Ins. Co.*, 14 F. App'x 210, 212 (4th Cir. 2001) ("The burden is on an insurance beneficiary to prove his or her total disability benefits under a Plan."); *see also Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 549 (4th Cir. 2001) (finding that under *de novo* review, a plan properly denied a beneficiary's claim "because she did not prove that she was totally disabled under the terms of the long term disability plan"). It is not the Plan's responsibility to prove that Gilbert is not disabled. *See Schulte v. Bos. Mut. Life Ins. Co.*, No. JKB-14-419, 2015 WL 7273148, at *9 (D. Md. Nov. 18, 2015) ("[I]t is not Defendant's responsibility to adduce evidence that Plaintiff is *not* disabled within the meaning of the LTD Policy; it is rather Plaintiff's obligation to prove that she *is* disabled."). Under the Plan, Gilbert must establish that she "cannot perform the majority of

the Substantial and Material Duties of any Gainful Occupation for which [she is] or may reasonably become qualified based on education, training, or experience," and that her disability is "not subject to any of the Limitations" listed in the Plan.  AR 6109.

## II.    Lyme Disease

In assessing whether Gilbert has demonstrated a long-term disability not subject to the limitations for Mental Health Conditions or Special Conditions, the Court first evaluates Gilbert's claim that her disabling symptoms are traceable to Lyme disease.  Although Gilbert has reported that Dr. Mangat diagnosed her with Lyme disease in 2016, and she has submitted records from Dr. Jemsek reflecting that he has been treating her for Lyme disease with antibiotics since 2016, the diagnosis and treatment plan has been disputed or questioned by a substantial number of doctors who have examined Gilbert or reviewed her medical records.  These include the following doctors retained by Principal:

- Dr. Myerson, who performed an examination of Gilbert prior to the initial benefits determination, concluded that the Lyme disease diagnosis is not supported by "evidence-based medicine" and that Dr. Jemsek's treatments "are not necessary and are not effective." AR 391.  Rather, Dr. Myerson has asserted that Gilbert "likely has a somatization syndrome."  AR 392.

- Dr. Hanrahan, who conducted a medical file review prior to the initial benefits determination, disagreed with the Lyme disease diagnosis because it was not supported by lab testing and concluded that Dr. Jemsek's "alternative treatment" of multiple courses of antibiotics is "not recommended and [has] no documented efficacy."  AR 409.

- Dr. Kempf, who examined Gilbert during the first appeal, found no clinical or serologic evidence supporting a Lyme disease diagnosis, that it was not supported by the CDC guidelines, and that Gilbert was not receiving appropriate treatment for her "multitude of subjective symptoms." AR 577.

- Dr. Wirtz, who conducted a medical file review during the first appeal, rejected the Lyme disease diagnosis because the clinical data from her test results were "not consistent with acute or late onset of Lyme disease" and there were "no objective findings of Lyme disease at any stage of disease." A.R. 602. He agreed that Gilbert should stop taking the antibiotics prescribed by Dr. Jemsek.

- Dr. Raymond, who conducted a medical file review during the second appeal, concluded that "there is a dearth of positive laboratory test results or medical opinions to either support or confirm a diagnosis of Lyme disease as noted within the guidelines of the CDC." AR 927.

Significantly, several of Gilbert's own physicians generally agreed that there is no basis to conclude that Gilbert currently has Lyme disease:

- Dr. Taragin, a neurologist who examined Gilbert in advance of her first appeal, reported that Gilbert's neurologic examination was normal and that there was "no clear evidence that she has neurologic or systemic Lyme disease." AR 568. Rather, he raised the concern that the long term use of antibiotics as treatment for Lyme disease "may in fact be causing her symptoms." AR 568.

- Dr. Sirdofsky, a second neurologist visited by Gilbert in advance of her first appeal, stated that Gilbert had "never had a Lyme rash or clear-cut Lyme arthritis or Lyme

meningitis" and that based on her negative IgG result, her positive IgM result was "likely a false positive." AR 561, 563.

- Dr. Shenderov, the infectious disease physician Gilbert visited in advance of her first appeal, found that Gilbert's symptoms were not consistent with "neuro-Lyme," and that she "may not have had Lyme at all." AR 595. Even if she had, Dr. Shenderov stated that Gilbert had "had more than enough doxycycline to cure Lyme and other tick borne illnesses." AR 595. While Dr. Shenderov noted that Gilbert's symptoms "could fit post-treatment Lyme disease syndrome," she found "no neurological or rheumatological signs or red flag symptoms." AR 595. She recommended that Gilbert stop the antibiotics and "then see what symptoms remain and require workup." AR 595.

The medical evidence in support of Dr. Jemsek's diagnosis is exceedingly limited. Although Gilbert reports that she was originally diagnosed with Lyme diagnosis in 2016 by Dr. Mangat, it does not appear that medical records relating to that diagnosis or Gilbert's four months of treatment with Dr. Mangat are included in the record. While Gilbert points to Dr. Ng, her primary care physician, the record on Dr. Ng's views is limited to her 2020 responses to a questionnaire about Gilbert's symptoms and ability to work in which she listed chronic Lyme disease as the original diagnosis as of September 2016, without explanation or analysis, which suggests that she simply accepted Dr. Jemsek's diagnosis without any independent review. Only Dr. Shostak, a clinical psychologist who was recommended to Gilbert by Dr. Jemsek, made findings consistent with those of Dr. Jemsek when he diagnosed Gilbert with significant neurocognitive impairments that were "highly consistent with the construct of Lyme encephalopathy." AR 1038.

In weighing the competing medical opinions, the courts consider a variety of factors. A court may fairly place greater weight on the opinions of doctors who had actually examined and interviewed the patient over those who only reviewed the claimant's medical records. *See Bilheimer v. Fed. Express Corp. Long Term Disability Plan*, 605 F. App'x 172, 182 (4th Cir. 2015) (affirming a district court's determination based on having given greater weight to the opinions of examining physicians); *Neumann*, 367 F. Supp. 2d at 990. Also relevant is whether a reviewing physician explains why the offered opinion differs from the opinion of the treating physician. *See e.g., Gorski v. ITT Long Term Disability Plan for Salaried Emp.*, 314 F. App'x. 540, 547 (4th Cir. 2008) (noting that a reviewing physician's opinion was problematic where the physician "never revealed why he rejected the view of the other doctors"). Further, courts have highlighted the need for medical opinions to tie their analysis of the patient's medical condition to the patient's ability to work. *See e.g., Sabatino v. Liberty Life Assurance Co. of Bos.*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) (noting that while the plan "argue[d] that the medications taken by Plaintiff are not disabling because Plaintiff can perform sedentary work," the "[i]nability to perform sedentary work is not the definition of disability set forth in the policy").

Here, eight different physicians offered opinions that reject or are inconsistent with the position that Gilbert's symptoms and disability were attributable to Lyme disease, including two physicians who conducted independent medical examinations on behalf of Principal and, significantly, three treating physicians who were selected by Gilbert. These physicians generally explained their conclusions, focusing in particular on the objective fact that test results for Lyme disease did not meet the CDC guidelines for a diagnosis of Lyme disease. In contrast, only Dr. Jemsek offered a diagnosis with any explanation in the record. There are no records providing the specific basis for Dr. Mangat's original diagnosis in 2016. In her questionnaire response, Dr. Ng

23

effectively restated Dr. Jemsek's diagnosis without any independent consideration. Dr. Shostak, to whom Gilbert was referred by Dr. Jemsek, also appears to have relied primarily on Dr. Jemsek's diagnosis. Although Dr. Shostak could be viewed as having diagnosed Gilbert with Lyme encephalopathy, his opinions were directly criticized by Dr. Raymond, contradicted by Dr. Stowell, and inconsistent with those of Gilbert's own neurologists, Dr. Taragin and Dr. Sirdofsky, who did not identify any similar conditions.

On balance, considering not only the number of doctors who rejected or questioned the Lyme disease diagnosis, but also the fact that several of them were doctors selected by Gilbert, and the fact that the diagnosis is not supported by test results meeting the criteria in the CDC guidelines, the Court finds that Gilbert's claim that she has Lyme disease which is causing her symptoms is not supported by the weight of the record evidence.

The fact that the SSA separately granted disability benefits to Gilbert does not alter this conclusion. In *Smith v. Continental Casualty Company*, 369 F.3d 412 (4th Cir. 2004), the court emphasized the difference between SSA decisions and an insurance company's determination of a claimant's eligibility for LTD benefits under a private benefit plan, stating that "what qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan—the benefits provided depend entirely on the language in the plan." *Id.* at 420. Moreover, the SSA's determination relating to Gilbert was not based on any independent medical examination or review commissioned by the SSA which established Lyme disease. Rather, the SSA explicitly recognized that it was giving "significant credence" to Dr. Jemsek's assessments as the treating physician. AR 718. Such reliance on and deference to a treating physician's opinion is not required in the ERISA context.

The United States Supreme Court has held that ERISA plan administrators are not required to accord any special deference to the opinions of treating physicians over those of non-treating consultants. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (stating that while plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician … courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician …"). Such a bright line rule would fail to consider other important factors, including a physician's expertise, relationship to the patient, and any applicable biases or incentives. *See id.* at 832. Here, where the SSA determination relied almost entirely on Dr. Jemsek's diagnosis and was made without the benefit of numerous other medical opinions, including those based on additional medical examinations, it does not require a different result.

Finally, Gilbert's argument that the Court may not rule against her based on the lack of objective evidence of her disability is not persuasive. Where a plan does not explicitly require objective proof, a claim should not be denied solely on the basis that the claimant's proof lacked objective evidence. *See Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 171 (4th Cir. 2013). In this instance, the Plan does not require proof of objective medical evidence. Rather, the term "Proof of Disability" is defined in the Plan as:

> Written proof that Disability exists and has been continuous must be sent to The Principal within six months after the date a Member completes an Elimination Period. Proof required includes the date, nature, and extent of the loss. Further proof that Disability has not ended must be sent when requested by The Principal.

AR 6086. However, even without substantial objective evidence, there is no dispute that Gilbert has a disability. The finding that Gilbert does not have Lyme disease is not based solely on a lack of objective evidence, but is based on the test results that affirmatively fail to meet the CDC

guidelines, as well as the opinions of the numerous physicians.  Thus, the Court concludes that the disability is not caused by Lyme disease.

### III.    Plan Limitations

In the absence of a showing that Gilbert's symptoms were caused by Lyme disease, Principal argues that the evidence shows that Gilbert's disability is the result of a Mental Health Condition or a Special Condition as defined in the Plan, which would limit her to 24 months of disability benefits.  Specifically, Principal argues that the evidence shows that her disability is the result of either SSD or one of the "enumerated Special Conditions."  Def.'s Mot. at 20, ECF No. 45-1.  A federal court has characterized SSD as follows:

> Somatic symptom disorder is characterized by an extreme focus on physical symptoms—such as pain or fatigue—that causes major emotional distress and problems functioning.  You may or may not have another diagnosed medical condition associated with these symptoms, but your reaction to the symptoms is not normal.  You often think the worst about your symptoms and frequently seek medical care, continuing to search for an explanation even when other serious conditions have been excluded.  Health concerns may become such a central focus of your life that it's hard to function, sometimes leading to disability.

*Ian S. v. Comm'r of Soc. Sec.*, No. 20-CV-6022-A, 2021 WL 3292203, at *2 n.5 (W.D.N.Y. Aug. 2, 2021) (quoting Somatic symptom disorder: Symptoms & causes, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sc-symptom-disorder/symptoms-causes/syc-20377776).

Principal has offered substantial evidence that Gilbert's symptoms and disability were caused at least in part by SSD.  Dr. Stowell, who performed an IME during the second appeal, specifically diagnosed Gilbert with SSD based on "numerous physical symptoms causing disruption in daily life with high levels of anxiety related to health and symptoms, in addition to excessive time and energy spent on the symptoms and health concerns."  AR 1002.  Dr. Stowell found that Gilbert's neuropsychological test responses also "suggest chronic low-to-moderate

symptoms of depression" including low energy, mental fatigue, and preoccupation with physical functioning, which limit her abilities to perform tasks that require more than a brief amount of time, focus on projects, and participate in meetings. AR 1003. This diagnosis echoed the view of Dr. Myerson, who conducted the first IME on Gilbert during the initial benefits determination, who concluded that Gilbert "likely has a somatization syndrome." AR 392.

Similarly, Dr. Li, who conducted a file review during the second appeal, found "no conditions" supported by Gilbert's medical records that explained her symptoms but stated that they "may be explained by a somatoform disorder, fibromyalgia or chronic fatigue syndrome." AR 636, 639. Further, Dr. Farache, who conducted his own file review during the second appeal, stated that "somatization disorder appears to be the cause of [Gilbert's] symptoms and reported impact on her functionality" but deferred to "an appropriate specialist" for a more detailed assessment. AR 287. Taken together, these opinions provide a substantial basis to support the SSD diagnosis.

Dr. Shostak, however, disagrees with this conclusion and has instead asserted that Gilbert's symptoms are "neither somatic in nature nor psychiatric related." AR 1038. Specifically, Dr. Shostak asserts that Gilbert "showed impairments in the mechanisms involved in specific and crucial areas of her neurocognition" and suggests that Dr. Stowell did not have the same findings because "[t]hese symptoms would not be very apparent in a well-defined, simplified, and cue-specifying context, such as a one to one clinical interview." AR 1038. Her symptoms, Dr. Shostak contends, are "highly consistent with the construct of a Lyme encephalopathy." AR 1038.

Dr. Shostak's opinion, however, is premised on his claim that Gilbert has Lyme disease or Lyme encephalopathy, which in turn derives from Dr. Jemsek's diagnosis which, as discussed above, the Court rejects based on the objective test results and the opinions of the multiple other

doctors. Notably, Dr. Taragin, Gilbert's own neurologist found that Gilbert's neurological test results were normal, highlighting the lack of any physical condition causing Gilbert's symptoms and disability. Where the Court does not accept Lyme disease as the basis for Gilbert's disability, in the absence of an alternative medical explanation, the Court gives credence to the SSD diagnosis, particularly where Dr. Shostak has agreed that Gilbert has significant emotional symptoms that at least partially explain her symptoms. AR 1040. The Court therefore finds that the weight of the evidence supports the conclusion that many of Gilbert's symptoms underlying her disability are the result of SSD.

Even if the record does not firmly establish that Gilbert's disability is fully attributable to SSD, a review of her primary symptoms reveals that some of her core symptoms fall within the definition of a Special Condition, to which the 24-month limitation on benefits applies. The symptoms reported by Gilbert consist primarily of "severe, debilitating fatigue," daily headaches, confusion, brain-fog, debilitating chills, chest pain, neuropathy, joint pain, and occasional nausea. Under the Plan, the Special Conditions include "headaches," "chronic fatigue syndrome," and fibromyalgia, which is a condition that causes widespread pain, fatigue, and mental and emotional distress. *See* Fibromyalgia, Centers for Disease Control and Prevention, https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (last visited Aug. 16, 2022). Where Gilbert has been diagnosed with SSD, and headaches, fatigue, and chronic, unexplained pain form the core of the conditions underlying Gilbert's disability, the Court agrees that the limitations based on a Mental Health Condition and Special Conditions would apply unless Gilbert can establish that separate from these conditions, she has other conditions that would render her disabled.

## IV.    Other Physical Conditions

Gilbert argues that even if the Court does not find that her disability derives from Lyme disease and instead finds that she has SSD, she has other physical conditions which on their own are sufficiently debilitating that she is properly deemed disabled based on those conditions alone. Specifically, Gilbert identifies the following other conditions: (1) heart arrythmia and varying blood pressure; (2) neuropathy; and (3) impairments in her neurocognition as identified by Dr. Shostak. However, Gilbert has failed to put forth proof that because of these conditions, she "cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation." AR 6109.

As to the heart and blood pressure related issues, Gilbert references the findings of SVT arrhythmia, as reported by Dr. Urquhart, her cardiologist. Dr. Urquhart, however, has asserted that "[h]er palpitations are controlled on her current medication regimen" and has not identified any restrictions or limitations required by that condition. AR 465. Dr. Urquhart was aware of Gilbert's reports of chest pain and blood pressure issues but has not stated that those conditions prevent her from working.

The skin biopsy has established that Gilbert has small fiber neuropathy, but the report containing the diagnosis does not describe the impact on Gilbert or how it might limit her activity. *See Sabatino*, 286 F. Supp. 2d at 1232. Neither Dr. Taragin nor Dr. Sirdofsky has concluded that the small fiber neuropathy is both causing her numbness and pain and that such impact is rendering her unable to work. Notably, during his examination, Dr. Taragin acknowledged Gilbert's reports of numbness and pain in her chest, leg, and arms, but identified no physical condition causing those symptoms even after an EMG test. The only doctor to assert whether or not this condition is impairing is Dr. Farache, who has asserted that as part of his medical file review he called Dr.

Taragin, Gilbert's own neurologist, and they both agreed that the small fiber neuropathy would not be impairing.  Although Gilbert argues that it is improper to rely on this second-hand account of Dr. Taragin's position, she has provided no contrary assessment from Dr. Taragin or any other physician.

Gilbert has not provided any opinions from doctors other than Dr. Jemsek offering opinions on whether the small fiber neuropathy is disabling or otherwise poses limitations, and it is not even clear whether Dr. Jemsek concluded that small fiber neuropathy alone renders Gilbert disabled. Rather, Dr. Jemsek stated, after a consultation with Gilbert on July 28, 2020, that "[t]o no one's surprise, she has small fiber neuropathy. . . and this of course is highly commensurate with Lyme borreliosis complex. . . Fortunately, she has only mild tingling and no real neuropathic pain in the distal lower extremities." AR 1027.

As for the alleged neurocognition issues, Dr. Shostak has highlighted the presence on her MRI of "multiple small lesions in the deep white matter of both cerebral hemispheres." AR 1036. After reviewing the MRI, Dr. Mangat has noted an assessment of "[e]ncephalopathy, unspecified" and also "advised [Gilbert] to have IV antibiotics," which she initially declined, but Dr. Mangat has nowhere asserted that this diagnosis is limiting or debilitating. AR 1037. Though Dr. Shostak referenced the MRI results as supporting his conclusion that Gilbert has "significant impairments" in her neurocognition, AR 807, he asserts that these impairments "were highly consistent with the construct of a Lyme encephalopathy" rather than with SSD. AR 1038. Where Dr. Shostak's evaluation is tied to a Lyme diagnosis which the Court has found not to be supported by the weight of the evidence, it does not provide a basis to conclude that Gilbert had a physical condition in her brain causing her disability. Notably, Dr. Shostak's analysis was called into question by Dr. Raymond, who described his report as "essentially uninterpretable from a neurodiagnostic

perspective" because it was "cursory and nonstandardized," AR 927, and it was contradicted by Dr. Shenderov's finding that there were "no neurological… signs or red flag symptoms at all," AR 595, and Dr. Taragin's assertion that there is "no clear evidence that she has neurologic or systemic Lyme disease," AR 568. Accordingly, Gilbert has not met her burden of showing that she has a physical condition that renders her unable to work separate and apart from any impact of SSD. *See Weisner*, 192 F. Supp. 3d at 617 ("Cumulatively, then, the evidence corresponding to the particularized impact of Plaintiff's medical conditions on his ability to perform his material and substantial duties is tenuous.").

The crux of this case is whether or not Gilbert is disabled under the terms of the Plan and not subject to a Limitation Provision. A thorough review of the record shows that Gilbert has not presented sufficient evidence to show that she was disabled due to Lyme disease or another physical condition, that instead the evidence shows that her disability is primarily the result of some combination of SSD and Special Conditions such as headaches and chronic fatigue, and that Gilbert has not established that other conditions separately cause her to be disabled. The Court therefore finds that Gilbert is subject to the 24-month limitation on her disability benefits.

Because the Court upholds Principal's determination, it need not address Principal's additional argument that Gilbert does not qualify for LTD benefits because she is not receiving appropriate care, as required by the Plan. *See* AR 6109 (stating that the requirements for Benefit Qualification include that the claimant is "under the Regular and Appropriate Care of a Physician").

## CONCLUSION

For the foregoing reasons, Principal's Motion for Judgment on the Administrative Record will be GRANTED, and Gilbert's Motion for Judgment on the Administrative Record will be DENIED. A separate Order shall issue.

Date: August 16, 2022

THEODORE D. CHUANG
United States District Judge